

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

LOLITA CURRY,                          )
                                       )
                Plaintiff,             )
                                       )
        v.                             )      Case No. 06 C 4701
                                       )
Michael J. Astrue[1],                  )      Magistrate Judge
Commissioner of Social                 )      Arlander Keys
Security,                              )
                                       )
                Defendant.             )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Lolita Curry, moves this Court for Summary Judgment, pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, to reverse or remand the final decision of the Commissioner of Social Security (the "Commissioner"), who denied her claim for Supplemental Security Income Benefits. 42 U.S.C. § 401 et seq. (West 2007). Defendant has filed a Cross-Motion for Summary Judgment, asking this Court to affirm the Commissioner's final decision. For the reasons set forth below, the Court Grants Plaintiff's Motion for Summary Judgment, and remands the matter back to the Commissioner for further proceedings consistent with this Opinion.

---

[1] On February 12, 2007, Michael J. Astrue took over as the new Commissioner of the Social Security Administration. His name has been substituted in for that of Jo Anne B. Barnhart, who served in that capacity when this case was filed and whose name appeared on the original complaint.

## FACTS AND PROCEDURAL HISTORY

Ms. Curry applied for Supplemental Security Income benefits on September 27, 2004, alleging that she had not been able to work since February 3, 2002, due to heart and lung conditions, extreme obesity, and arthritis. R. at 18-19, 65. At the time of her application, Plaintiff weighed 410 pounds. R. at 64. The SSA denied her claim initially on June 23, 2005, and again on reconsideration on August 16, 2005. R. at 20, 29-32. Ms. Curry requested a hearing, and her case was assigned to ALJ Paul Armstrong. The hearing was held on March 8, 2006.

The ALJ first heard testimony from Ms. Curry. Ms. Curry testified that she weighs 386 pounds and attended college for one year. R. at 261, 263. With respect to her daily activities, she testified that she started caring for her chronically ill, paraplegic, incontinent, and mentally challenged daughter in 1991. R. at 261-63. She has trouble changing her daughter's diapers, because she has to "stand and be hand over hand." *Id.* at 261. For the last four years, she has had nursing assistance for sixteen hours daily to assist her in caring for her daughter and has a friend and cousin who assist her with household chores such as cooking and laundry. R. at 261, 267-68.

2

Ms. Curry stated that in 2001, she began following a low sodium, 1200 calorie diet. R. at 261-62. In order to sleep well at night, she uses a CPAP machine; without it she suffers from headaches and stops breathing at night. *Id.* at 262. Additionally, she sometimes wakes up during the night, because her legs feel like they have electricity going through them, forcing her to sit up. *Id.* at 270. Osteoarthritis causes significant pain in her hands, but Ms. Curry stated that she does have the ability to open and close them, to reach to the left and right with her arms, and to write. R. at 263-64. As for walking, Ms. Curry stated that, although she told the consultative examiner that she could walk three blocks, this was no longer the case, because of her increase in weight. R. at 264. Now, she can only walk short distances before having to sit and rest. *Id.*

Ms. Curry testified to a number of other health concerns, including: cervical cancer in 2002, which required surgery; as well as her need for an inhaler; high blood pressure medication; and a nebulizer, which she must use twice a day. R. at 264-66. Ms. Curry testified that, during the hearing, she was experiencing discomfort and pain in her right and left hip, and she was short of breath. R.

at 266.  She said that she had a great deal of distress while preparing to come to the hearing and, as a result, had to treat herself with two puffs of Albuterol, because her asthma flared up. R. at 267. Ms. Curry said that pain in her legs, knees, hips, and hands, and her chest tightness had grown worse over the past years. R. at 268. She was prescribed nitroglycerine, which she was required to take three times a week. *Id.* Before taking the nitroglycerine, her symptoms included numbness of her arm, with an inability to move it, and shooting pains that caused her to vomit. *Id.* Approximately ten minutes after taking the nitroglycerine, her chest pain would be less severe, but she would still feel fatigued. R. at 268-69. At one point, she was prescribed Vicodin and 800 milligrams of ibuprofen for pain, which she took daily. R. at 270-71. When Counsel asked Ms. Curry why her treating physician instructed her to elevate her legs, she explained that her legs swell and become dark purple. R. at 271. Since 2002, Ms. Curry has been suffering from swelling problems and was prescribed hydrocortizine for the fluid buildup and therapy. R at 272. Additionally, she suffers from gout and takes Indomethacin to treat it. When she does get a gout flare-up, she cannot

wear shoes, touch her feet, or bend her toes, and her feet become hot. *Id.*

Counsel asked Ms. Curry whether she could perform a job that required her to sit at a desk eight hours a day and perhaps answer phones or direct people seeking assistance. R. at 273. She responded that she would have difficulty performing this type of job, because she would be unable to sit very long, and she would have to keep her legs elevated, because of the swelling in her ankle and foot. R. at 273–74. Although elevating her legs does not relieve the pain in her knee, it does control her swelling. R. at 273. She said having to put her foot on the floor would cause it to become numb, and if she stood on it, she would be unable to feel it. R. at 274. She said that she cannot do much standing or walking. *Id.* The last time she did any extended standing, she was in a store. She testified that she had to get store personnel to provide a cart for her to ride in, because she was unable to feel her legs. R. at 275.

The ALJ next granted permission to the medical expert ("ME") Dr. Earnest Mond, to question Ms. Curry. The ME stated that he had a number of problems with Ms. Curry's testimony. R. at 275. First, the ME asked Ms. Curry if she

had coronary artery disease and had to have a stent placed. *Id.* Ms. Curry replied that this was correct, explaining that she underwent the procedure in 2001 at the University of Chicago Hospital. *Id.* The ME noted that, although there was mention of the disease and the procedure in the consultative medical examination, there was no evidence in the record about coronary artery disease or Ms. Curry having had a stent or angiogram. *Id.* Next, the ME stated that there was no evidence or documentation in the record to support a finding that Ms. Curry suffered from congestive heart failure or cardiomyopathy. R. at 276. The ME further stated that, as far as he could tell from the record, Ms. Curry did not suffer from cancer of the cervix, though there was evidence of the papilloma virus on the cervix. *Id.* He noted, however, that Ms. Curry has obvious morbid obesity and she currently weighed 383 pounds. *Id.*

The ME testified that Ms. Curry has hypertension. Though she had been in the hospital for "out of control" blood pressure, her failure to take her medication for a few months likely caused her blood pressure to skyrocket. R. at 277. He also stated that he saw no indication that Ms. Curry suffers from asthma, and that her heart size is normal, which is contrary to a diagnosis of congestive heart

failure and myopathy. R. at 277-78. As to Ms. Curry's sleep apnea, the ME stated that the medical evidence demonstrates that it is severe, but that the CPAP machine alleviates her symptoms. R. at 278. Additionally, a number of stress tests in the record were either inconclusive or borderline. *Id.* X-rays showed very minimal osteoarthritis and minimal degenerative changes. R. at 278-79. However, he noted that she was in physical therapy. R. at 279. The ME testified that Ms. Curry's treating physician apparently feels that the key to resolving her problems, especially with her knee, would be weight loss, which is not easy to achieve. *Id.* The February 11, 2005 consultative examination showed tenderness of both hips and left knee, but no deformity of any joint. *Id.* Additionally, the consultative examination showed a slight decrease of range of motion in the hips, and flexion in the left knee, likely due to Ms. Curry's obesity. *Id.* During the examination, the consultative physician noted that Ms. Curry did not have any problem getting on and off the examination table and did not need an assistive device. *Id.* However, her gait was described as slow and wobbly. *Id.* The ME testified that, in his opinion, the sum of Ms. Curry's impairments did not meet or equal any listing. *Id.*

The ALJ then questioned the ME in regard to the residual functional capacity (RFC) assessment performed by Ms. Curry's treating physician. In particular, he inquired as to whether Ms. Curry having to elevate her leg above the heart was necessary, and he also asked the ME's opinion regarding the treating physician's notes of increased edema in Ms. Curry's left leg. R. at 280-81. The ME testified that he saw no justification for Ms. Curry having to elevate her legs above heart level. *Id.* at 280. As to her edema, the ME said that the record indicated that Ms. Curry sometimes suffers from edema and one plus edema, but he would not consider this to be a problem, especially in a person who is severely overweight. R. at 282. The ME further opined that, even if Ms. Curry suffered from occasional one plus edema, the use of compressive stockings, not elevation of the legs above heart level, would be the way to approach the problem. R. at 286. Ms. Curry stated that there had been discussion of prescribing the stockings to her, but Dr. Cifu never prescribed them. *Id.*

With regard to Ms. Curry's RFC, the ME testified that Ms. Curry has the ability to occasionally lift ten pounds and frequently lift less than ten pounds. R. at 279. She can stand/walk at least two hours and sit for at least six

hours in an eight-hour workday. *Id.* Additionally, the ME determined that Ms. Curry cannot climb ladders, ropes, or scaffolds, but can occasionally climb stairs and ramps. *Id.* Because of her pulmonary problems, she should avoid extreme cold, pulmonary irritants and unprotected heights. *Id.*

The ME testified that he was unsure as to whether Ms. Curry needed a cane, because one year prior, the consultative examination by Dr. Panagos noted that Ms. Curry did not need assistive devices for ambulation. R. at 284. He stated that there was a note in the record that Ms. Curry has an enlarged heart. However, the ME noted that it was not an overwhelming finding, given that subsequent X-ray reports specifically show that her heart size is normal. R. at 285. With regard to her hip and knee pains, the ME testified that, with minimal findings and gross obesity, he had no doubt that Ms. Curry does experience pain in both her hip and knee. R. at 286. Overall, the ME stated that he did not patently reject anything in Dr. Cifu's RFC assessment. *Id.*

The ALJ granted Ms. Curry's Counsel an opportunity to examine the ME. Counsel asked the ME whether Ms. Curry's sleep apnea, combined with her obesity, could cause her to be short of breath, even while sitting and moving around in

her chair. R. at 282. The ME testified that he did not believe she would be short of breath in this situation, but slight exertion could cause her to be short of breath. Id. He said she could experience shortness of breath if she were required to get up and down out of a chair. R. at 283.

The ALJ next heard testimony from vocational expert ("VE") James Breen. The ALJ asked the VE about Ms. Curry's relevant work experience. R. at 287. The VE testified that, in the last fifteen years, there was no relevant past work experience. Id. The VE also noted that Ms. Breen received her GED in 1986. Id. The ALJ added that Ms. Curry's past educational experience also included one year of college, which resulted in her receiving her CNA. Id.

The ALJ asked the VE to assume a hypothetical situation where an individual was limited to sedentary exertional duties; no climbing of ropes, ladders, or scaffolds; and no concentrated exposures to noxious fumes, odors, respiratory irritants, or extremes of cold and humidity. R. at 288. Additionally, the ALJ asked the VE to assume that this individual was unable to do work at unprotected heights, or around dangerous moving machinery, open flames, or bodies of water. Id. Allowing for these limitations, the ALJ asked whether such an individual would be able to do any work in

10

the region or national economy. *Id.* The VE testified that there is a wide range of unskilled, sedentary, clerical type of occupations that such an individual would be able to undertake. Specifically, the VE testified that an individual subject to the restrictions described by the ALJ could work as a charge account clerk, for which there are 5,500 positions; an information clerk, which accounts for 3,500 positions; or a surveillance system monitor, which account for 5,000 positions. *Id.*

Subsequently, the ALJ asked the VE whether, given Ms. Curry's limitations, she would have the ability to engage in unskilled, sedentary, clerical type occupations or any other jobs. Specifically, the ALJ asked the VE to consider what jobs might be available for an individual who: (1) was required to elevate both legs above the heart at least half of the workday; (2) did not have to elevate her legs but would miss at least two days a month because of pain, and side effects of medication, and the like; (3) could report to work daily and was not required to elevate her legs, but because of periodic or exacerbations caused by asthma, shortness of breath, pain, and side effects from medication would be off task even on simple sedentary jobs for more than fifteen minutes out of every hour; or (4) worked in the

type of positions that the VE had described, but could only reach to the side or front within her reaching area only five percent of the day. R. at 287-90.

The VE testified that any one of these limitations would preclude an individual from performing unskilled, sedentary, clerical type occupations, as well as any other jobs. *Id.* Additionally, in response to questions by Ms. Curry's Counsel, the VE testified that, if an individual was required to elevate her legs and sit back, and was not able to reach a desk or similar work station, then that individual would be precluded from sedentary occupations. R. at 290-91.

## MEDICAL EVIDENCE

In addition to hearing testimony from Ms. Curry, the ME, and the VE, the ALJ considered a variety of medical records. The Court will discuss these records in full.

## THE UNIVERSITY OF CHICAGO HOSPITALS: MARCH 2001 TO AUGUST 2005

On March 19, 2001, Ms. Curry made an initial clinic visit to the University of Chicago Hospital, where she was examined by Dr. Adam Cifu. R. at 162. Dr. Cifu's notes begin with a brief history of her ongoing illnesses of hypertension and obesity. *Id.* He noted that, over the

12

past three years, her hypertension had been uncontrolled and that she had not been on any antihypertensive medication for two weeks prior to her visit to the clinic. *Id.* With regard to her obesity, Ms. Curry told Dr. Cifu that she has always struggled with being overweight, but that over the past few years she had gained 120 pounds, bringing her current weight to 334 pounds. *Id.* The results of Dr. Cifu's physical examination and assessment showed that Ms. Curry was morbidly obese, but she did not appear to be in acute distress. R. at 163. He restarted her antihypertensive therapy, prescribing Dyazide. *Id.*

A review of her cardiovascular system was notable for occasional "sticking pain' in her chest. R. at 162. These pains were said to be sharp, usually fleeting pains, and occurred both with exertion and with other types of activities. *Id.* Given his physical examination of Ms. Curry, Dr. Cifu concluded that she almost certainly suffered from sleep apnea and noted that she possessed many risk factors of coronary artery disease. *Id.* Ms. Curry's lungs and heart appeared to be normal, and her extremities showed no signs of edema. *Id.*

On April 7, 2001, Ms. Curry went to the University of Chicago Hospital for lab work and weight control counseling.

13

It was noted that she was being worked up for Cushing's syndrome. R. at 161. She reported that she had no changes in diet or exercise patterns, and that she currently did not regularly exercise. Id. She was characterized as an obese, but well-appearing woman. Id. Ms. Curry was encouraged to exercise at least three times a week for twenty minutes, and was educated about weight control. Id.

Ms. Curry was examined by resident Dr. Wilcox on January 28, 2003. Ms. Curry primarily complained of chest pain and high blood pressure, but also stated that she was having shortness of breath, nausea, and vomiting. R. at 149. On examination, Dr. Wilcox found that Ms. Curry had a "Cushingoid" appearance, and that he heard obvious crackles and wheezing. R. at 150. He noted trace and one plus edema to ankles and decreased heart sounds. Id., R. at 152. Additionally, his notes show that Ms. Curry suffered from poorly controlled hypertension, daytime somnolence, chronic leg swelling, a mildly enlarged heart, unstable angina, and polyuria. R. at 150-56. Tests on her heart revealed left ventricular hypertrophy and reversible myocardial ischemia. R. at 146-47. Also, Dr. Wilcox thought it was likely that she suffered from obstructive sleep apnea, but stated that a

sleep study would be needed for confirmation of this diagnosis. R. at 154.

Ms. Curry saw Dr. Cifu on April 29, 2003, after what he described as a "prolonged hiatus." R. at 140. Since the last time she had been in his office, Dr. Cifu noted that her obesity had persisted, but was stable. Id. As to her hypertension, he stated that she had been taking the Dyazide intermittently. Id. Dr. Cifu added Hydrochlorothiazide and Atenolol, to treat her hypertension. Id. As to the obstructive sleep apnea, Dr. Cifu noted that Ms. Curry was scheduled for a CPAP titration. Id. Dr. Cifu administered an exercise tolerance test which resulted in a borderline abnormal reading. Id. Reviews of her pulmonary and cardiovascular systems were unremarkable. Id.

On March 17, 2004, Ms. Curry was admitted into the hospital complaining of a cough with productive yellow sputum, and sinus pressure. R. at 138. Additionally, she complained of radiating chest pain and an increase in shortness of breath over the past four to five months. Id. Dr. Cifu concluded that, given her underlying pulmonary abnormalities, Ms. Curry was suffering from reactive airways disease, likely caused by viral infection. R. at 134. Dr. Cifu stated that she did not carry a diagnosis of asthma.

*Id.* He observed that she continued to suffer from
obstructive sleep apnea, and that she had been taking her
medications for hypertension as prescribed. *Id.* Upon
discharge, Ms. Curry was given an Albuterol inhaler, which
she was to use every four to six hours to help ease her
breathing. R. at 137.

On March 29, 2005, Ms. Curry visited the clinic for a
routine examination. Dr. Cifu opined that Ms. Curry's blood
pressure was "out of control." R. at 218. He noted that
she had not been taking her antihypertensive medications as
prescribed. *Id.* There were no symptoms of asthma, and Dr.
Cifu thought that Ms. Curry was using the Albuterol a little
too frequently. *Id.* As for Ms. Curry's sleep apnea, Dr.
Cifu said he would get her scheduled for a sleep study, and
discussed the possibility of gastric bypass in the future.
*Id.* She complained of severe pain in her knees and toes,
especially when going up and down stairs. *Id.* The doctor
suspected that she was suffering from gout and perhaps
chondromalacia. *Id.* She had a borderline positive exercise
tolerance test, with no symptoms. *Id.*

Ms. Curry had a radiological examination of both knees
on March 31, 2005. The X-rays showed that the tibial spines
were sharpened bilaterally; however, both knees were

16

otherwise normal. R. at 131. These findings were found to be consistent with very minimal osteoarthritic disease. *Id.*

After hospitalization for hypertensive urgency, Ms. Curry visited the clinic on April 21, 2005. R. at 129. Dr. Cifu's physical examination showed that Ms. Curry appeared well, with no acute distress, and that her weight was 333 pounds. *Id.* Ms. Curry's EKG was normal, with borderline LVH. R. at 130. He noted that she appeared to be experiencing some depression. *Id.* In regard to Ms. Curry's hypertension, Dr. Cifu noted that it was under better control. *Id.* As to her severe joint pain, Dr. Cifu stated that weight loss would be the key to improving this. *Id.* Dr. Cifu noted that Ms. Curry continued to suffer from obstructive sleep apnea and requested a sleep study. *Id.* In response to Ms. Curry's complaints of atypical chest pain, Dr. Cifu sent out CK and troponins. *Id.* They came back normal, as he expected. *Id.* However, he noted that there was some chest and wall tenderness. *Id.*

On April 30, 2005, Ms. Curry underwent a polysomnogram to evaluate her symptoms of snoring, restless sleep, observed apnea, excessive daytime somnolence, insomnia, and restless legs. R. at 209. She was placed on a CPAP Titration. *Id.* Ms. Curry reported significant improvement

17

in the quality of her sleep while on CPAP, and said that she
would be willing to use it at home on a continued basis.  R.
at 210.

On May 20, 2005, Dr. Cifu wrote a letter at the request
of Ms. Curry outlining her medical problems.  The letter
listed Ms. Curry's medical impairments as:  morbid obesity,
severe hypertension, obstructive sleep apnea, and
osteoarthritis.  R. at 166.  He stated that she needed to be
on CPAP (attaching the results of the polysomongram of April
30, 2005) and said she was hospitalized from March 29- 31,
2005 for hypertensive urgency.  *Id.*  Additionally, Dr. Cifu
noted that she needed to receive physical therapy for her
knees.  *Id.*

Ms. Curry visited Dr. Cifu for a routine clinic visit on
June 2, 2005.   Dr. Cifu's notes show that her hypertension
was under control.  R. at 176.  She reported that she had
recently experienced an asthma flare up, but Dr. Cifu noted
that it was presently under control.  *Id.*  Her obstructive
sleep apnea was being treated through the use of CPAP.  *Id.*
Her weight was 338.75 pounds.  *Id.*  He noted that pulmonary
and cardiovascular systems were unremarkable.  *Id.*  With
regard to her knee pain, she recently had begun physical
therapy.  *Id.*

18

Ms. Curry next visited Dr. Cifu on August 9, 2005. He noted that Ms. Curry was using her medications as prescribed, and increased her Lisinopril. R. at 216. As to her obesity, Dr. Cifu reported that it appeared she had gained weight (then at 342 pounds) since her last visit, although she was seen by a nutritionist. *Id.* He said she did realize how important it was for her to lose weight, and instructed her to continue meeting with the nutritionist. *Id.* Dr. Cifu noted that Ms. Curry's asthma was stable, and that she should continue CPAP to treat her obstructive sleep apnea. *Id.* Ms. Curry complained of leg pain, which Dr. Cifu stated was mainly related to her arthritis. *Id.* Her lower left extremities showed increased edema. *Id.*

## EMERGENCY ROOM STROGER HOSPITAL OF COOK COUNTY: FEB. 2006

In February of 2006, Ms. Curry was admitted to the emergency room at Stroger Hospital of Cook County. The discharging resident, Dr. Yadav, made a primary diagnosis of headache, nonanginal chest pain, hypertension, asthma, obstructive sleep apnea on CPAP, coronary artery disease, and post cath x2. R. at 244. The results of the physical examination showed that Ms. Curry was suffering from very high blood pressure and she was characterized as morbidly obese. *Id.* It was noted that her obstructive sleep apnea

19

may not be well controlled and that her headaches were likely secondary to the sleep apnea. R. at 245. Dr. Yadav stated that Ms. Curry's chest pain was possibly secondary to uncontrolled hypertension, heart disease, or coronary artery disease. *Id.* Upon discharge, Ms. Curry was restarted on all her antihypertensives and her blood pressure was well controlled. *Id.* She was advised to use CPAP regularly and recommended to follow-up in the sleep clinic. *Id.*

## CONSULTATIVE SOURCES

Dr. Alexander Panagos examined Ms. Curry On February 11, 2005, for the Bureau of Disability Determination Services. R. at 121. Dr. Panagos noted that Ms. Curry is 64.5 inches tall and weighed 333.5 pounds. R. at 124. Examination of both hips and knees revealed tenderness. R. at 125. She was unable to squat, kneel, or run. *Id.* Further examination revealed that Ms. Curry did not have finger or hand grasp limitations, and that she did not need an assistive device to ambulate, though she walked with a slow and waddling gait. *Id.* Dr. Panagos noted that Ms. Curry did not have difficulty getting onto and off the examination table. *Id.* Dr. Panagos' clinical impression revealed that Ms. Curry suffered from the following problems: cardiomyopathy with balloon stent placement;

asthma; morbid obesity, arthritis of the hips, left knee, and great right toe; status-post cholecystectomy and colectomy; partial thickness burns; and hypertension. R. at 124-25.

Ms. Curry visited Dr. James Becket for a radiological evaluation of her right hip and left knee on February 21, 2005. R. at 126. With regard to Ms. Curry's right hip, the X-ray showed no identifiable fracture or dislocation. *Id.* There was minimal acetabular sclerosis, suggesting minimal degenerative change, and the joint space appeared to be adequately maintained. *Id.* The X-ray of her left knee showed minimal irregularity of the undersurface of the patella. *Id.* It was noted that the irregularity could be related to chondromalacia of the patella or that it could be degenerative in nature. *Id.* A small knee joint effusion could not be excluded. *Id.* The X-ray showed no evidence of spurring or significant degenerative change. *Id.* Additionally, no fracture was identified. *Id.*

On June 8, 2005, Ms. Curry visited Midwest Medical Providers to receive stress treadmill testing. She complained primarily of chest pain. R. at 179. Prior to her physical examination, Ms. Curry reported that she usually did not use Nitroglycerine, but that when she did

use the medicine, it helped relieve her chest pain. *Id.*
Her height was recorded as 63 inches and her weight was
recorded as 303 pounds. R. at 180. Dr. Rabinowitz reported
that, during the stress treadmill test, Ms. Curry did not
display any signs of acute distress and did not complain of
chest pain. R. at 180. He noted that, though her heart
tones were distant, Ms. Curry's heart showed no signs of
thrills, heaves, rubs, gallops, or murmurs. *Id.* The doctor
did note end expiratory wheezes and moderately decreased
breath sounds. *Id.*

Additionally, he noted that moderate peripheral edema
was present. *Id.* The doctor's report also showed that a
mild hypertensive response to exercise developed. *Id.* The
test was terminated prematurely due to shortness of breath,
fatigue, and inability to continue the test. *Id.* Dr.
Rabinowitz's impressions were as follows: 1) history of
congestive heart failure, moderately well compensated on
therapy; 2) history of chest pain secondary to coronary
artery disease, status post percutaneous transluminal
angioplasty with recurrent chest pain consistent with
angina, and inconclusive stress treadmill test for ischemia.
*Id.*

## RESIDUAL FUNCTIONAL CAPACITY ASSESSMENTS

Medical consultant Dr. Henry Bernet completed a physical RFC questionnaire on behalf of the Disability Determination Services on June 20, 2005.  Dr. Bernet concluded that Ms. Curry could do the following:  1) occasionally lift and/or carry a maximum of twenty pounds, and frequently lift and/or carry a maximum of ten pounds; 2) stand and/or walk about six hours in an eight hour workday; 3) sit for about six hours in an eight hour workday; 4) push and/or pull, without any restrictions except for those given for lift and/or carry; 5)  occasionally climb ramp/stairs, stoop, kneel, crouch, and crawl; 6) never climb ladders/ropes/scaffolds; 7) and frequently balance.  R. at 193-94.

No manipulative, visual, or communicative limitations were established.  R. at 195.  With regard to environmental limitations, Dr. Bernet stated that she could tolerate unlimited exposure to extreme cold and heat, wetness and humidity, and noise and vibration.  R. at 196.  Dr. Bernet opined that Ms. Curry should avoid concentrated exposure to fumes, odors, dusts, gases, and hazards such as machinery and heights.  *Id.*

23

Dr. Cifu completed a physical RFC questionnaire on August 16, 2005. He diagnosed Ms. Curry with hypertension, morbid obesity (5'4, 340 lbs.), obstructive sleep apnea, and osteoarthritis. R. at 203. Overall, he said her prognosis was poor. *Id.* Her symptoms included chronic lower extremity pain and activity-limiting dyspnea. *Id.* Ms. Curry's knee pain was an eight out of ten, secondary to her obesity, and severe enough to interfere with her attention and concentration frequently. R. at 203-04. Additionally, he noted that she suffers from mild depression. *Id.* at 204. Dr. Cifu opined that Ms. Curry would be incapable of working even low-stress jobs, because of her inability to move, secondary to pain, and severe fatigue, secondary to sleep apnea, even when treated. R. at 205.

Dr. Cifu concluded that Ms. Curry could do the following: 1) continuously sit/stand for no more than five minutes at one time; 2) walk less than one city block without rest or severe pain; 3) sit and stand/walk less than two hours in an eight hour workday; 4) perform work requiring repetitive reaching with arms in an eight hour workday five percent of the time; 5) and occasionally lift less than ten pounds and never lift more than ten pounds. *Id.,* R. at 207. Dr. Cifu also stated that during an eight

hour workday, Ms. Curry would have to get up every ten
minutes and take a two minute walk; take unscheduled breaks
every thirty minutes, with duration of five to ten minutes;
and with prolonged sitting, she would have to elevate her
legs above heart level. R. at 206. If she had a sedentary
job, her legs would have to be elevated 100% of the workday.
*Id.* While engaging in occasional standing/walking, Dr. Cifu
stated that Ms. Curry would need an assistive device. R. at
207. Dr. Cifu concluded that Ms. Curry would be unable to
stoop and/or crouch. *Id.* Dr. Cifu stated that Ms. Curry's
impairments would likely produce good and bad days, and that
she would be absent from work more than four times a month
due to her impairments. R. at 208.

## THE ALJ'S DECISION

The ALJ issued his decision on April 14, 2006. He
concluded that Ms. Curry was not disabled within the meaning
of the Social Security Act (SSA), and denied her claim for
benefits. R. at 11. After finding that Ms. Curry had not
been engaged in any substantial gainful activity at any time
relevant to the decision, the ALJ determined that the
medical evidence provided by both the treating and
consultative sources supported a finding that Ms. Curry
suffers from the following severe impairments: obesity,

arthritis, hypertension, asthma, and sleep apnea. R. at 13. However, he found that both treating and consultative sources agreed with State agency findings that these impairments did not meet or equal the severity criteria of any listing. R. at 14.

The ALJ concluded that Ms. Curry has the RFC to perform sedentary work, with no concentrated exposure to noxious fumes, odors, respiratory irritants; no exposure to extremes of cold and humidity; no climbing of ropes, ladders, or scaffolds; no work at unprotected heights, or around dangerous moving machinery, open flames, or bodies of water. R. at 14-15. Although the ALJ found that Ms. Curry's medically determinable impairments could reasonably produce the symptoms she complained about, he said that "claimant's statements concerning the intensity, duration, and limiting effects of these symptoms are not entirely credible." R. at 15. He stated that the medical evidence establishes that Ms. Curry has severe impairments that result in some limitations, but are not totally disabling. *Id.* He found that her testimony that she is a caregiver for her bedridden daughter, and that she performs household chores, is inconsistent with the notion that she is totally disabled to perform even sedentary work. *Id.*

The ALJ gave little weight to the State agency's finding that Ms. Curry's severe coronary artery disease, obesity, and sleep apnea permitted her to perform light work. *Id.* He found that her osteoarthritis in the hip and knee, along with her extreme obesity, would affect prolonged standing and/or walking, and that the State's assessment did not adequately account for this information. *Id.*

The ALJ then considered Dr. Cifu's RFC assessment, and stated that Dr. Cifu's assessment basically restricted Ms. Curry to working sedentary jobs. *Id.* Dr. Cifu's RFC assessment stated among other things, that: (1) Ms. Curry should elevate her legs above the heart level for 100% of the time during an 8-hour workday and can use her arms only 5% during an 8-hour workday; (2) Ms. Curry has severe pain and fatigue that only permits her to walk one block before stopping for rest, and permits her to only sit and stand continuously for no more than five minutes. *Id.* The ALJ found no explanation for these two restrictions, and found them to be inconsistent with both Ms. Curry's treating physician's notes and Ms. Curry's testimony of self-reported activities. R. at 15-16. Therefore, the ALJ gave little weight to the treating physician's assessment beyond the sedentary restriction. R. at 16. The ALJ instead adopted

the RFC assessment given by the ME at the hearing, as he found it to be consistent with the medical evidence in the record. *Id.*

After deciding that Ms. Curry had no past relevant work experience, the ALJ considered what other jobs she could perform, given her age of 38 years, her education, and the RFC he adopted from the ME. *Id.* Relying on the VE's testimony, the ALJ determined that Ms. Curry would be able to perform the requirements of representative occupations such as Charge Account Clerk, Information Clerk, and Surveillance System Monitor, and that these jobs existed in significant numbers in the national economy. R. at 17. Therefore, the ALJ concluded that Ms. Curry was "not disabled." *Id.*

The ALJ's decision became the final agency decision when the Appeals Council denied review on August 11, 2006. *See 20 C.F.R. § 416.1481.* Ms. Curry then filed this lawsuit, seeking review of the agency's decision and an award of Supplemental Security Income benefits, based upon disability. The parties consented to proceed before a magistrate judge, and the case was reassigned to this court on November 28, 2006. Thereafter, both parties moved for summary judgment. Ms. Curry requests that the Court reverse

the decision of the ALJ and remand for an award of benefits, or in the alternative, for further proceedings. The Commissioner has filed a cross-motion for summary judgment, asking the Court to affirm the ALJ's findings.

## STANDARD OF REVIEW

A district court reviewing an Administrative Law Judge's (ALJ) decision must affirm if the decision is supported by substantial evidence and free of legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla," it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). In reviewing an ALJ's decision for substantial evidence, the Court may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue,* 478 F.3d 836, 841 (7th Cir. 2007) (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts. *Herr v. Sullivan,* 912 F.2d 178, 181 (7th Cir. 1990).

Where "the Commissioner's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded. *Steele*, 290 F.3d at 940. An ALJ must articulate his analysis by "build[ing] an accurate and logical bridge from the evidence to [his] conclusions so that [the Court] may afford the claimant meaningful review of the SSA's ultimate findings." *Blakes ex rel Wolfe v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003). In addition, although the plaintiff bears the burden of demonstrating her disability, "[i]t is a basic obligation of the ALJ to develop a full and fair record." *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991) (citing *Smith v. Sec'y of Health, Education and Welfare*, 587 F.2d 857, 860 (7th Cir. 1978)). "Failure to fulfill this obligation is 'good cause' to remand for gathering additional evidence." *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000).

## SOCIAL SECURITY REGULATIONS

An individual claiming a need for Supplemental Security Income ("SSI") must prove that he or she has a disability under the terms of the SSA. In determining whether an individual is eligible for benefits, the social security regulations require a sequential five step analysis. First, the ALJ must determine if the claimant is currently

employed. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir.2000). Next, a determination must be made as to whether the claimant has a severe impairment. *Id.* The ALJ then must determine if the impairment meets or equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1. At step four, the ALJ must determine the claimant's RFC. *Id.* An evaluation must be made as to whether the claimant can perform his or her past work. *Id.* Finally at step five, the ALJ must decide whether the claimant is capable of performing work in the national economy *Id.* At steps one through four, the claimant bears the burden of proof; at step five, the burden shifts to the Commissioner. *Id.*

## DISCUSSION

The conflict between Ms. Curry and the Commissioner primarily arises out of the ALJ's step four evaluation. Specifically, Ms. Curry argues that her treating physician's RFC assessment did not receive proper evaluation or weight. The Commissioner contends that the ALJ's rejection of Dr. Cifu's opinion and his adoption of the ME's RFC assessment was reasonable and supported by substantial evidence.

The "treating physician rule," states that a treating physician's opinion regarding the severity and nature of the

claimant's impairments is entitled to controlling weight, if the treating source's opinion is well supported by the medical evidence in the record and is not inconsistent with other substantial evidence. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (citing 20 C.F.R. § 404.1527(d)(2)). Courts recognize that a long clinical relationship between the treating physician and the claimant generally affords the treating physician with more knowledge of the claimant's impairments, and, therefore, more weight will be given to the treating physician's opinion. *Id.* at 870. *But see Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir.2004) (holding that a treating physician may be too close to the claimant to be objective in determining if the claimant is disabled).

This case illustrates the challenges faced by an ALJ in determining whether to accept or reject assessments made by treating physicians regarding the functional capacity of their patients. Despite the strict requirements placed on the ALJ by the Social Security Regulations and the courts' interpretation of those Regulations in analyzing cases in this area, an ALJ must comply therewith or risk a remand. After rejecting the State agency's finding that, notwithstanding Ms. Curry's multiple severe impairments, she could

still perform light work, the ALJ stated that he
"considered" the RFC assessment submitted by Dr. Cifu,
which, he claims, restricted her to basically performing
sedentary job tasks. The ALJ appears to have rejected Dr.
Cifu's assessment only to the extent that he believed that
Ms. Curry would need to be able to elevate her legs above
the heart level 100% of the time while sitting during an 8-
hour workday, and that she could use her arms to reach only
5% of the time during an 8-hour workday. R. at 15. The ALJ
rejected that part of Dr. Cifu's opinion, because the doctor
did not explain why she would need to elevate her legs and
why she could not reach more than 5% of the time. He
further found that these restrictions appeared to be
inconsistent with Dr. Cifu's own treatment records and with
Ms. Curry's self-reported daily activities.

The problem with this analysis is that the ALJ did not
point to any specific record evidence to contradict Dr.
Cifu's assessment in this regard and, as a reviewing court,
the Court cannot speculate as to the basis for the ALJ's
finding. The ME testified that he saw no *justification* for
Dr. Cifu's opinion that Plaintiff needs to be able to
elevate her feet while sitting, but he did not cite to any
particular evidence that would refute this opinion. R. At

33

280, 285-86. Indeed, the ALJ did not even refer to the ME's testimony on this critical issue in his decision.

From its review of the Record, the Court can appreciate the skepticism with which the ALJ viewed the RFC assessment prepared by Dr. Cifu. However, the Court cannot supply a rationale for the ALJ's reasoning which he did not offer. The ALJ could have asked questions of Ms. Curry regarding the circumstances surrounding the completion of the RFC questionnaire, which appears to have been sent to Dr. Cifu by her attorney or taken to him by her during her August 2005 visit. Ms. Curry visited Dr. Cifu on August 9, 2005, and the questionnaire is dated August 16, 2005. R. at 202-208. It is possible that the questionnaire was completed by Dr. Cifu asking Ms. Curry the questions from the questionnaire, and simply writing her answers on the form. See R. at 280. That could account for the seemingly extreme limitations placed on the form by Dr. Cifu and could affect the weight to be given his opinions. On the other hand, those limitations could represent the true severity of Ms. Curry's impairments. The fact is that, based on the record as it now stands, the Court is unable to determine whether the RFC prepared by Dr. Cifu or the opinion of the ME represents Ms. Curry's true RFC.

Moreover, the ALJ's comment that Dr. Cifu's RFC
relegated Ms. Curry basically to sedentary work is
erroneous. He did much more than that with his
restrictions-whether justified or not- when he concluded
that she can never lift ten pounds, needs to get up and walk
for two minutes every ten minutes, would need to take 5-10
minute breaks every 30 minutes and would need to be absent
from work more than four times per month. This would render
her unemployable. Therefore, resolution of the competing
opinions of Dr. Cifu and the ME regarding Ms. Curry's RFC is
critical.

In addressing the specific issues raised by Plaintiff,
the Court cannot agree, without further elaboration, with
the ALJ's finding that Dr. Cifu's RFC assessment is
inconsistent with his treatment record, Ms. Curry's
testimony, and her self-reported activities. The ALJ stated
that Dr. Cifu's RFC indicates that Ms. Curry suffers from
severe pain and fatigue that renders her incapable of
walking one block without rest, and incapable of sitting
and/or standing for more than five minutes continuously.
Dr. Cifu's treatment notes, as well as the notes of
consultative sources, report that Ms. Curry suffers from
morbid obesity, osteoarthritis, edema, gout in her lower

extremities, and obstructive sleep apnea, even when treated. R. at 124-25, 150, 152, 154-56, 180, 245. The ALJ does not explain why the restrictions noted by Dr. Cifu are inconsistent with Ms. Curry's documented impairments.

The ALJ also noted that Ms. Curry's daily activities, including caring for her paraplegic daughter, cooking, cleaning, doing laundry, and vacuuming suggest that she is not too disabled to perform sedentary work. R. at 15. This Circuit has recognized that there are differences between household work and work in the labor-market. *Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir.2005). In *Clifford*, the court held that a claimant's ability to perform minimal daily activities does not establish that the claimant can perform substantial physical activity in the work environment. 227 F.3d at 872. In *Carradine v. Barnhart*, the Court held that the ALJ erred in deciding that the claimant's ability to perform sporadic physical activity equated to her ability to perform exertional and non-exertional work-related activities. 360 F.3d 751, 755 (7th Cir.2004). Ms. Curry testified that she cooks, cleans, does laundry, vacuums, and cares for her paraplegic daughter. She also testified that she needs and receives help in carrying out these tasks. The ALJ's conclusory assertion

that Ms. Curry's self-reported activities demonstrate that she is able to perform sedentary work is simply not supported by the record.

Ms. Curry also argues that the ALJ failed to consider Dr. Cifu's opinion that Ms. Curry would require unscheduled breaks, would be unable to stoop or crawl, would be absent from work more than four times a month, and that her pain would frequently cause her to lose attention and concentration. R. at 204-08. Additionally, she claims that the ALJ improperly evaluated Dr. Cifu's opinion that she would have to elevate her legs for the entire time during an eight-hour workday and that she would be unable to reach ninety-five percent of an eight-hour workday. R. at 206-07.

"The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *SSR* 96-8p, Westlaw, *7. The Commissioner argues that the ALJ did refer to Dr. Cifu's RFC assessment and that the ALJ pointed to specific portions of the RFC assessment that he found to be unsupported by the record. Defendant's Brief at 10. While the Court finds that the ALJ did consider *some* of the limitations mentioned by Ms. Curry when formulating his

37

hypothetical questions to the VE, he failed to address others. R. at 287-90.

For example, Dr. Cifu's RFC assessment concluded that Ms. Curry was unable to stoop. R. at 207. The ALJ's failure to address Dr. Cifu's opinion that Ms. Curry could not stoop is significant because, "[a] *complete* inability to stoop would significantly erode the unskilled sedentary occupational base and a finding that the individual is disabled would usually apply. . . " *SSR* 96-9p, Westlaw, *8. However, the ALJ failed to discuss these limitations when formulating Ms. Curry's RFC. The ALJ's failure to articulate his reasons for not discussing portions of Dr. Cifu's RFC assessment prevents the Court from conducting any meaningful review of the ALJ's decision to adopt the ME's RFC, which did not take into consideration some of the limitations set forth in Dr. Cifu's RFC assessment[2].

Ms. Curry next argues that the ALJ failed to properly evaluate her credibility pursuant to *SSR* 96-7p. Generally, the Court is required to give substantial deference to the

---

[2]Perhaps the ALJ determined that he had complied with SSR 96-8p by his statement that Dr. Cifu's RFC assessment was inconsistent with his treatment notes and Ms. Curry's self-reported activities and her testimony. However, as explained above, the Court finds the ALJ's reasons for rejecting Dr. Cifu's RFC to be inadequate.

ALJ's credibility determinations. *Steele v. Barnhart*, 290
F.3d 936, 942 (7th Cir. 2002). However, the Court will
review the ALJ's credibility determination when the ALJ
fails to explain why he found the evidence and/or testimony
credible or incredible. *Id.* Specifically, the ALJ is
required to engage in a two-step process. First, the ALJ
must decide whether the individual's impairments could
reasonably cause the symptoms the claimant complains of. 20
CFR §§ 404.1529(c)(4), 416.929(c)(4). If the ALJ finds that
the individual does have impairments that could reasonably
produce the symptoms the individual complains of, then the
ALJ must make a determination as to the intensity,
persistence, or functionally limiting effects of the
individual's symptoms on her ability to perform basic work
activities. *Id.* To make a determination at this step of
the analysis, the ALJ must consider the entire case record
including: medical records and laboratory findings, the
individual's own statements about the symptoms, medical
source opinions on the limiting effects of the symptoms, and
any other relevant evidence in the record. *Id.*

The ALJ summarized Ms. Curry's symptoms and concluded
at step one of the two-step process that her medically
determinable impairment could reasonably be expected to

produce her alleged symptoms. R. at 15. However, he found
that medical evidence did not support her statements that
she is totally disabled. Id. Furthermore, the ALJ noted
that Ms. Curry's daily activities, including caring for her
paraplegic daughter, cooking, cleaning, doing laundry, and
vacuuming, also suggested that she is not too disabled to
perform sedentary work. Id.

The Court is unable to determine whether the ALJ's
determination that Ms. Curry is not totally disabled is
supported by substantial evidence, because the ALJ failed to
adequately articulate why he did not consider Dr. Cifu's RFC
assessment. The ALJ also appears to have relied heavily on
Ms. Curry's testimony regarding her daily activities in
making his determination that she is not totally disabled.
As discussed above, this circuit has recognized that there
are differences between household work and work in the
labor-market. Gentle at 868. Thus, the Court concludes that
on remand, the ALJ must explain the inconsistencies between
Ms. Curry's testimony of daily activities and the medical
evidence so that the Court may conduct a meaningful review
of his credibility determination.

Ms. Curry contends that the ALJ erred because he failed
to discuss significant evidence. Specifically, she states

that he failed to discuss her severe fatigue, daytime
somnolence, polyuria, and abnormal ECGs. The ALJ must
address all of a claimant's documented impairments when
making a determination of whether to award disability
benefits. *SSR* 96-8p, Westlaw *5. The ALJ must discuss
these impairments even when they are not considered to be
"severe." *Id.*

Upon review of the record, the Court concludes that,
while the ALJ properly evaluated Ms. Curry's polyuria and
ECG reports, the ALJ's decision does not indicate whether he
properly evaluated Ms. Curry's obstructive sleep apnea.
Although the ALJ mentioned that obstructive sleep apnea was
a severe impairment at step two of his analysis, the ALJ
failed to analyze the symptoms of this impairment: severe
fatigue and daytime somnolence. The Commissioner asserts
that the record indicates that Ms. Curry's sleep apnea was
improved through the use of CPAP. Defendant's Brief at 11.
However, in Dr. Cifu's RFC assessment, he noted that she
suffered from severe fatigue secondary to sleep apnea. The
Court finds that the ALJ did not properly analyze Ms.
Curry's fatigue and daytime somnolence and he must do so in
accordance with *SSR* 96-8p.

Ms. Curry next argues that the ALJ failed to properly analyze her obesity alone and in combination with her other impairments, contrary to Social Security Ruling 02-1p. Social Security Ruling 02-1p mandates that the ALJ consider obesity in steps two through five of the disability determination. SSR 02-1p, 2000 WL 628049 (S.S.A.), at *1. The ALJ's failure to evaluate Mr. Curry's obesity at steps two through five is a sufficient reason to remand the case. *Young v. Barnhart*, 282 F.Supp.2d 890, 896 (N.D. Ill.2003).

The ALJ considered Ms. Curry's obesity as a severe impairment; however, he did not find that Ms. Curry's obesity alone, or in combination with her other impairments, resulted in a listing-level impairment. Ms. Curry argues that, at step four, the ALJ did not consider her obesity in his adoption of the ME's RFC assessment. Specifically, she states that the ALJ only discussed her obesity in terms of rejecting the State agency's RFC assessment. The ALJ explained that the State agency's finding that Ms. Curry would be capable of performing light work was entitled to little weight because, "It appears that the claimant's osteoarthritis, in the hip and knee, along with her extreme obesity, would affect prolonged standing and or walking and was not adequately considered in the assessment." R. at 15.

The Court finds that this statement demonstrates that, when

deciding on which RFC assessment to adopt, the ALJ did

consider Ms. Curry's obesity along with her other

impairments. The ALJ adopted the ME's RFC assessment, and

the ME testified that Ms. Curry's primary limitation was her

obesity and expressed his opinion that he had no doubt that

her obesity aggravated her hip and knee pain.

## CONCLUSION

For the reasons set forth above, the Court finds that

the ALJ's decision that Ms. Curry is not disabled is not

supported by substantial evidence, in that he did not build

an accurate and logical bridge between the record and his

ultimate conclusion that she is not disabled. Accordingly,

the Commissioner's Motion for Summary Judgment is Denied and

Plaintiff's Motion for Summary Judgment is Granted. This

case is remanded to the Commissioner for further action

consistent with this Opinion.

Dated: September 6, 2007      ENTER:

Arlander Keys

ARLANDER KEYS
United States Magistrate Judge